TRENTON BRATCHETT,
      Plaintiff,

      v.                                             Case No. 08-CV-00880

BRAXTON ENVIRONMENTAL SERVICES CORP.,
ERIN BRAXTON, SGT. WAYNE HIBBLER,
CAPTAIN MCPIPE, GRADY DAVIS, and
MS. STONE,
      Defendants.

## DECISION AND ORDER

Now before me are motions for summary judgment filed by defendants Wayne Hibbler, Eloise McPike,[1] Christine Stone and Grady Davis regarding plaintiff's Eighth Amendment failure to protect claims.

### I. BACKGROUND[2]

Plaintiff Trenton Bratchett is a former state inmate who resided at Felmers O. Chaney Correctional Center ("Felmers") from June 10, 2005, through August 2, 2006. Felmers is a community corrections facility operated by the Wisconsin Department of

---

[1] Eloise McPike was incorrectly identified by plaintiff as Captain McPipe. I will refer to her in this order by her correct name.

[2] Plaintiff has not objected to defendants' proposed findings of fact or submitted his own. Therefore, I will deem the defendants' uncontroverted statements of fact admitted for the purpose of deciding summary judgment. See Civil L.R. 56(b)(4) (E.D. Wis.). I have also reviewed and will consider the facts set forth in the Affidavit of Trenton Bratchett filed August 8, 2011 (Docket # 142-1) and the testimony plaintiff gave at his depositions on July 17, 2012, and November 27, 2012. The transcripts of these depositions were submitted to the court in support of defendant Davis' motion for summary judgment.

Corrections ("DOC") that focuses on work release to reintegrate inmates into society by helping them develop job skills, a positive work ethic and self-sufficiency.

Defendant Captain Eloise McPike has been employed by the DOC as a Supervising Officer 2 at Felmers since October 31, 2004. Defendant Wayne Hibbler was employed by the DOC as a Work Release Coordinator at Felmers from April 14, 2002, through January 16, 2009. The Work Release Coordinator assists all inmates in work-related activities, including obtaining employment and scheduling travel for work release. Defendant Christine Stone was employed by the DOC as a social worker at Felmers from June 1, 2000, through July 5, 2011. I will refer to McPike, Hibbler and Stone as the "State Defendants."

Defendant Grady Davis was an employee of ATTIC Correctional Services, Inc. ("ATTIC") from June 2003 through June 2008 and November 2008 through February 2010. ATTIC is a non-profit agency that places its employees with area correctional institutions to promote offender acquisition of appropriate social behavior and self-sufficiency. Davis was an Employment Support Specialist at Felmers. In this position, Davis provided inmates with information regarding job readiness, assisted with inmate resume building and helped facilitate classes in connection with the work release program. Employment Specialists also assist the Work Release Coordinator in all work-related activities, which means Hibbler supervised Davis.

**A. Felmers Work Release Program**

Inmates who transfer to Felmers are typically expected to complete an internal work assignment prior to being eligible for work release outside of the center. Upon arrival at

2

Felmers, an inmate receives an Inmate Handbook, which provides a general overview of staff responsibilities and rules with which inmates must comply. The Inmate Handbook has a section titled Work Release, setting forth the general rules that apply to the Felmers Work Release Program. These rules have not changed significantly since at least 2004. These rules provide, among other things, that an inmate may not quit his job without permission from the Work Release Coordinator, that inmates are expected to work the job for six months, and that injuries at the work release center should be reported immediately.

Felmers did not contract with potential employers to hire inmates, and jobs were found by the inmate and defendant Hibbler scouring the want ads to identify possible jobs that the inmate was qualified to perform. Inmates were then required to submit job applications and participate in job interviews to obtain employment. Inmates were expected to work a job for at least six months because obtaining at least six months of continuous work experience would enhance their chances of obtaining employment upon release. Hibbler was aware that local temporary employment agencies required at least six months work experience before they would consider hiring a worker.

**B. Plaintiff's Employment & Injury**

After he was transferred to Felmers, plaintiff worked in the kitchen for approximately six months. While plaintiff was working in the Felmers kitchen, Hibbler assisted plaintiff in identifying job sites that would potentially hire him. Plaintiff had no work experience and very little education. Hibbler suggested plaintiff apply to A&E Services ("A&E") (identified by plaintiff as "Braxton Environmental Services Corporation"), a tire recycling business in Milwaukee operated by Eric Braxton. Hibbler had no personal relationship with Braxton, but

3

knew that A&E had previously hired inmates who had no work experience. Plaintiff applied for a job at A&E and was hired.

Plaintiff's pay from A&E was put into an account administered by the DOC. A number of paychecks from A&E were not honored or bounced, resulting in funds being removed from plaintiff's account without his knowledge. There were also a number of weeks when plaintiff worked at A&E for more than forty hours but was not paid for any overtime. These issues were not addressed or stopped by Felmers staff. Plaintiff also got muddy at work and was scratched by wires. There did not appear to be first aid supplies at A&E, but plaintiff received peroxide, ointment or a band-aid from the nurse at Felmers on two occasions. His scratches did not require stitches.

On June 22, 2006, Larry White, another worker at A&E, was injured so severely that plaintiff thought he would lose part of his right arm. An ambulance was called, and the Milwaukee Police Department arrived to complete an injury report. A Milwaukee Police Department officer or detective interviewed plaintiff for the injury report and gave plaintiff a business card to call if plaintiff had more to say. The next day, June 23, 2006, Occupational Safety and Health Administration ("OSHA") inspectors came to the tire recycling plant for an inspection due to the injury Larry White had suffered.

On July 6, 2006, plaintiff submitted three separate offender complaint forms discussing the work conditions at A&E. One of these complaints related to plaintiff's concerns about taking time off due to dental pain, sick days and Hibbler's disapproval. Another related to plaintiff's issues with his pay and hours, and also mentioned that the job was very dangerous without providing any details. The third complaint anticipated

4

retaliation for filing the first two complaints and said that plaintiff was not being treated the same as other inmates.

Rather than placing these offender complaints in the locked box where they would normally go, plaintiff handed them to a third shift sergeant when he was leaving Felmers for work in the morning. Although plaintiff retained copies of these complaints, the DOC has no record of their receipt, the assignment of an inmate complaint number or their disposition. There is no evidence that any of the defendants to this action ever received or reviewed the complaints.

A few days after filing the offender complaints, plaintiff asked to speak to the Superintendent, but the position was not staffed at the time. So, plaintiff was directed to the Acting Superintendent, Captain McPike. On or about July 9, 2006, Captain McPike received the Interview/Information Request Form signed by plaintiff. It stated: "I have been working at my job for more than seven months. For various reasons including, not being paid in a timely manner or not at all, I would like to resign my employment with A&E and seek a better job with consistent hours and pay. I would like this to be effective immediately." (Aff. Eloise McPike 4, ¶ 17 (ECF No. 174).) Captain McPike responded as follows: "This is not the proper procedure—see Sgt. Hibbler to be able to obtain new employment if you do your way, it is a violation of w/rules." (Id. ¶ 18.)

In his July 9, 2006, Interview/Request Form, plaintiff did not express any specific concerns related to work-place safety at A&E. Nor did he provide Captain McPike with any information related to other workers who had been injured while working at the business. Although she does not remember the specific date or time period, Captain McPike recalls talking to plaintiff about his employment at A&E. He complained that the work place was

5

dirty and that he did not like his job. Captain McPike told him to talk to Hibbler and plaintiff said he had talked to Hibbler. Captain McPike asked plaintiff if he wanted to obtain another job, and plaintiff said, "No, I'll stick it out." (Id. ¶ 21.)

On July 12, 2006, plaintiff was injured while working at A&E. He reached into a machine to attempt to remove some wires that were jammed in it. The machine restarted as his hand was in it, severing his finger. Plaintiff reached into the machine at the instruction of his supervisor at A&E.

At the time of his accident, plaintiff was working "wires," meaning he was working in the area of A&E where the wires from the tires were separated from the remainder of the tire components. Plaintiff was responsible for guiding the wires along conveyors to bins or recycling areas. At the time of the incident, plaintiff had been employed at A&E for seven months and had held several positions there. Plaintiff had worked "wires" on three or four prior occasions, though he had never previously worked on the machine that caused his injury. The machine on which plaintiff was working stopped as a result of a build up of wires in the machine. Plaintiff's supervisor informed plaintiff that the machine was in the off position and instructed plaintiff to remove the wires. Plaintiff could not see the stop button from where he was located, but he believed his supervisor that the machine was turned off. Plaintiff inserted his hand into the machine and removed some of the wire. Then, as he reached his hand in a second time, the machine resumed operation. Plaintiff felt pain in his hand, removed his glove, and saw his index finger on this left hand hanging there.

No ambulance was called, and the Milwaukee Police Department was not called. Treatment for plaintiff's injury was delayed, especially in comparison to what happened

6

when Larry White was injured. After plaintiff returned to Felmers, plaintiff was not allowed to call the Milwaukee Police Department to make a report. He later called OSHA secretly to report his injury. Plaintiff was later told that the machine had malfunctioned.

Plaintiff testified that his accident was the result of either his supervisor never having turned off the machine or the machine's malfunction. Plaintiff had never previously cleared an obstruction from a machine nor had he ever been asked to do so by a supervisor.

**C. Defendants' Knowledge of Conditions at A&E Services**

At no time was Hibbler aware of any OSHA violations at A&E. Hibbler had been involved in the Felmers Work Release Program for approximately five years, and at no time was he aware of any inmate (other than plaintiff) being injured while working at A&E. Hibbler regularly went to A&E to monitor plaintiff's and other inmates' work activities there. He observed tires being brought in on semi trucks and saw that the tires were often filled with dirt or mud so the workers would get dirty. He also observed workers using machinery to shred the tires but did not observe any unsafe work conditions, and plaintiff never expressed to Hibbler any concerns about work place safety or unsafe work conditions at A&E. If plaintiff had expressed such concerns, Hibbler would have brought the concerns to the attention of Captain McPike, his supervisor. If plaintiff had complained to Hibbler about work place safety conditions, and Hibbler was able to confirm that such unsafe conditions existed, Hibbler could have assisted plaintiff with obtaining other employment.

At no time was Captain McPike aware that plaintiff was subject to a serious and/or excessive risk of harm due to his participation in the Felmers Work Release Program and his employment at A&E. Nor was Captain McPike aware of any safety violations at A&E.

7

Captain McPike says she was aware of approximately 60 inmates who worked at A&E through Felmers' Work Release Program. She does not recall any inmate other than plaintiff being injured while on the job.

Christine Stone's only involvement in the Work Release Program was to participate in the determination that an inmate had completed all programming requirements to go out on work release. Once an inmate was in the Work Release Program and working with the Work Release Coordinator, Stone had no further involvement with the program except to get progress reports for scheduled program reviews. Stone was aware that Captain McPike provided supervision over the Work Release Program and that Hibbler was the Work Release Coordinator. Stone was aware that plaintiff had obtained employment at A&E. Stone also became aware that plaintiff was injured at the workplace on July 12, 2006.

Stone recalls seeing plaintiff prior to his injury, and he expressed work place concerns to her. Stone advised plaintiff to follow the chain of command and go first to Hibbler, then to Captain McPike, then to the Felmers Superintendent, to ensure that his concerns were adequately addressed. Stone had no first-hand, personal knowledge related to the working conditions at A&E. She had never been to the facility and was not aware of any safety violations there.

Plaintiff testified that he made complaints to Davis about A&E on approximately five occasions. However, he never complained to Davis of work conditions generally or dangers associated with the same, and he could not recall ever showing Davis scratches on his arm as proof that the job was dangerous.

Another former inmate, Michael Mays, gave a deposition in this case on November 27, 2012. He testified that he overheard another inmate, whose name he does

8

not remember, tell Davis and Hibbler that he did not want to return to work at A&E because it was "dangerous." It was Mays' understanding that the inmate was refusing to return to work because of the muddy conditions. Mays also was aware of multiple other inmates who complained about the muddy conditions. If an inmate in the work release program refused to work, the inmate had two choices: (1) return to work or (2) be transferred to the Milwaukee Secure Detention Facility ("MSDF"). On more than one occasion, Mays heard plaintiff tell Davis he did not want to return to work and Davis respond to the effect that plaintiff knew what his options were—plaintiff could either return to his job or he would be transferred to MSDF. Plaintiff decided to return to work.

## II. DISCUSSION

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

Plaintiff is proceeding on Eighth Amendment failure to protect claims against defendants Hibbler, McPike, Stone and Davis. All of the defendants argue that they are entitled to summary judgment on plaintiff's claims. Defendant Grady Davis argues that he was not acting under the color of state law and that plaintiff's work conditions did not violate

9

the Eighth Amendment because they did not present an excessive risk to plaintiff's safety.[3] The State Defendants submit that they did not disregard an excessive risk to plaintiff's safety and that their actions were too remote from plaintiff's injury to have caused it.

The response of plaintiff's pro bono counsel to defendants' motions consists of one five page document that is devoid of citations to law or fact. Plaintiff argues that defendant Davis had been on-site at Braxton more than once, had the chance to observe the conditions and unsafe equipment in use there, and knew or should have known that someone he sent to Braxton would get seriously hurt. Plaintiff suggests that the State Defendants rely on two conflicting theories. They want to portray Braxton as not an unreasonably dangerous work placement. They also want the court to believe that plaintiff just wandered into Braxton looking for a job, that he knew it would be risky, but that he took the job anyway and therefore is to blame for his subsequent injury.

The Eighth Amendment's prohibition of cruel and unusual punishment requires prison officials to "take reasonable measures to ensure an inmate's safety." Christopher v. Buss, 384 F.3d 879, 882 (7th Cir. 2004). Since prisoner work assignments are part of the conditions of confinement, the Eighth Amendment "forbids knowingly compelling an inmate to perform labor that is beyond the inmate's strength, dangerous to his or her life or health, or unduly painful." Ambrose v. Young, 474 F.3d 1070, 1075 (8th Cir. 2007) (quoting Sanchez v. Taggert, 144 F.3d 1154, 1156 (8th Cir. 1998)).

---

[3] I already considered and denied a motion for summary judgment by Davis regarding his argument that he was not acting under color of state law. (Decision and Order, Mar. 7, 2012, pp. 4–6, ECF No. 155). I will not consider this issue again.

"To state a claim premised on prison officials' failure to protect him from harm, [plaintiff] must allege that the defendants knew of and disregarded an 'excessive risk' to his 'health and safety.'" Christopher, 384 F.3d at 882. The question of defendants' culpability is subjective, but the risk is evaluated on an objective basis—the allegedly dangerous prison condition must deprive an inmate of "the minimal civilized measures of life's necessities." Id. "An objectively sufficiently serious risk is one that society considers so grave that to expose any unwilling individual to it would offend contemporary standards of decency." Id. In the subjective stage of the inquiry, deliberate indifference is "something approaching a total unconcern for [plaintiff's] welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm." Duane v. Lane, 959 F.2d 673, 677 (7th Cir. 1992). A defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994).

In Bagola v. Kindt, 39 F.3d 779, 780 (7th Cir. 1994), the Seventh Circuit reversed the dismissal of the complaint at screening where the plaintiff had been forced to work with dangerous machinery and lost his right hand. Bagola alleged that "all the defendants knew the Card Machines were unsafe and hazardous and had been cited by OSHA" and "all defendants chose to run the Card Machines despite the unsafe conditions." Id. The court noted that the plaintiff had alleged facts showing a history of accidents and also considered new evidence on appeal of another amputation four and a half months prior to plaintiff's injury.

At face value, the circumstances surrounding plaintiff's injury are not so grave that to expose an unwilling individual to them would offend contemporary standards of decency.

11

Plaintiff was working on a machine and the machine jammed with wire. Plaintiff's supervisor directed plaintiff to remove the jammed wire. Plaintiff asked his supervisor if the machine was turned off and the supervisor said yes. Only then did plaintiff put his hand in the machine. He was able to remove some of the jammed wire, and it was only when plaintiff put his hand back in to retrieve more wire that the machine restarted, injuring plaintiff's finger. Either the machine malfunctioned or plaintiff's supervisor was negligent or untruthful about the machine being off. Plaintiff's deposition testimony, however, paints a compelling picture regarding the objective risk of injury. Plaintiff's testified that the machines he was working with were old and in poor condition and that he was not given proper protective clothing. These circumstances could lead a jury to conclude that working at A&E presented an objectively serious risk of injury, especially in light of the injury suffered by Larry White.

Nonetheless, there is no evidence in the record to support a finding of deliberate indifference by defendants. Even if plaintiff faced an objectively serious risk of injury, defendants were not informed of the facts that would lead to that conclusion. Plaintiff's written and verbal complaints mentioned the word "dangerous," but mainly focused on his pay issues and his dislike of getting muddy or scratched. The use of the word "dangerous" without details left defendants to infer that plaintiff was referring to the fact that he was getting dirty and scratched. Additionally, there is no evidence that defendants knew about the injury to Larry White, who was not an inmate at the time of his injury. On the other hand, defendants were aware that they had placed at least 60 inmates for employment at A&E and that no one had been seriously injured. Since nothing plaintiff reported to defendants regarding his work conditions constituted a risk "so grave that to expose any

12

unwilling individual to it would offend contemporary standards of decency," Christopher, 384 F.3d at 882, no defendant could have consciously disregarded such a risk.

I also allowed plaintiff to proceed on Eighth Amendment claims against Braxton Environmental Services Corporation and Eric Braxton. A review of the record reveals that Braxton Environmental Services Corporation was personally served on February 23, 2010 (Docket #70) and that an Eric Broxton waived service on July 14, 2010 (Docket #190).[4] Neither of these defendants ever filed an answer to the complaint, and plaintiff never asked for entry of default or default judgment against them. In fact, plaintiff has taken no action against these defendants for over three years, even when represented by counsel. These claims may have been abandoned by plaintiff due to their weakness. Generally, workers compensation is the exclusive remedy for an employee who is injured in the workplace. Byers v. Labor and Industry Review Com'n, 208 Wis.2d 388, 395–96 (1997). And, to succeed on an Eighth Amendment claim, plaintiff would have to prove that his private employers were acting under the color of state law.

I will dismiss plaintiff's claims against Braxton Environmental Corporation and Eric Braxton with prejudice. "A dismissal with prejudice is a harsh sanction which should usually be employed only in extreme situations, when there is a clear record of delay or contumacious conduct, or when other less drastic sanctions have proven unavailing." Webber v. Eye Corp., 721 F.2d 1067, 1069 (7th Cir. 1983). Nevertheless, claims cannot drag on indefinitely without action as the rest of the case proceeds. In this case, there have been two rounds of dispositive motions but nothing filed regarding these defendants.

---

[4] The waiver of service was signed by an Eric Broxton. It is unclear whether this is the wrong individual or whether these names were misspelled by plaintiff in his pleadings.

13

Plaintiff has 21 days from the entry of this Order to petition for the reinstatement of these claims. See Civil L.R. 41(c) ("Whenever it appears to the Court that the plaintiff is not diligently prosecuting the action, the Court may enter an order of dismissal with or without prejudice. Any affected party may petition for reinstatement of the action within 21 days.")

**THEREFORE, IT IS ORDERED** that defendant Grady Davis' motion for summary judgment (Docket #166) is **GRANTED**.

**IT IS FURTHER ORDERED** that the motion for summary judgment filed by defendants Wayne Hibbler, Eloise McPike and Christine Stone (Docket #170) is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiff's claims against defendants Braxton Environmental Services Corporation and Eric Braxton are **DISMISSED WITH PREJUDICE** for failure to prosecute pursuant to Civil Local Rule 41(c).

**IT IS FURTHER ORDERED** that the Clerk of Court is directed to enter final judgment 21 days after this order if plaintiff has not moved to reinstate his claims against Braxton Environmental Services Corporation and Eric Braxton prior to that date.

Dated at Milwaukee, Wisconsin, this 5th day of September, 2013.

s/ Lynn Adelman
_____
LYNN ADELMAN
District Judge